IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE CINCINNATI INSURANCE COMPANY, | : | CIVIL ACTION NO. 1:15-CV-762 |
| | : | |
| | : | (Chief Judge Conner) |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| JONATHAN DRENOCKY and DEBORAH DRENOCKY, | : | |
| | : | |
| Defendants | : | |

## **MEMORANDUM**

The Cincinnati Insurance Company ("Cincinnati") seeks declaratory judgment against policyholders Jonathan and Deborah Drenocky (the "Drenockys"), arguing numerous contractual exclusions bar coverage of the Drenockys' insurance claim for water damage. Cincinnati now moves for partial judgment on the pleadings (Doc. 20) pursuant to Federal Rule of Civil Procedure 12(c). The court will deny Cincinnati's motion.

**I.**     **Factual Background and Procedural History**

This dispute arises out of an insurance claim for water damage to the Drenockys' residence. The Drenockys purchased land at 2819 Deer Chase Lane in York, Pennsylvania, in 1999. (Doc. 8 ¶ 9). Crawford Construction Company ("Crawford") built the Drenockys' home in 2001. (Doc. 1 ¶ 11). Heavy rainstorms during the Drenockys' first two years at the house often left accumulated water on two interior windowsills. (Doc. 8 ¶ 11). In 2004, the Drenockys commenced

litigation against Crawford (the "Crawford litigation"), alleging various construction problems, including improper window installation. (Id. ¶ 13). The Drenockys attribute early water accumulation to leakage through faulty Pella window sashes. (Id.)

Construction consultant Douglas MacKinney ("MacKinney") inspected the house in connection with the Crawford litigation and relayed his findings to Jonathan Drenocky ("Drenocky") in a letter dated September 9, 2010 (the "MacKinney letter"). (See Doc. 1 ¶¶ 14-15; Doc. 1-2 at 1). The MacKinney letter identified "the lack of any vapor barrier or flashing installed around the Pella doors and windows" as the cause of "water seepage," subsequently resulting in superficial damage to interior paint and trim. (Doc. 1-2 at 1). MacKinney ostensibly based his conclusions on photos taken during the original construction of the house rather than an invasive inspection of window installations and walls. (See id.) While inspecting the home's interior, MacKinney also noticed an odor in a second floor bedroom that he associated with trapped moisture. (Id.) MacKinney ascribed the moisture penetration to poor installation methods and warned that failure to correct the errors would result in additional damage. (See id. at 2). MacKinney attached to his letter an itemized estimate of recommended repairs, including the removal and replacement of stucco, replacement of framing and sheathing, and installation of flashing and vapor barrier around windows. (See id. at 7). The Drenockys never implemented MacKinney's recommendations. (See Doc. 8 ¶ 67).

The Crawford litigation ultimately ended without recovery in April 2013 after Crawford declared bankruptcy. (Id. ¶ 20). In the interim, the Drenockys obtained a

homeowners insurance policy with Cincinnati, effective March 17, 2013. (See Doc. 1-3 at 1). The policy covered "direct 'physical loss'" to insured property subject to relevant exclusions, to wit: loss caused by faulty "[d]esign, specifications, workmanship, repair, [or] construction" ("defective construction exclusion"), (id. at 22); loss caused by "[c]onstant or repeated seepage . . . of water," unless the seepage and resulting damage were unknown to the insureds and hidden ("seepage exclusion"), (id. at 23); loss caused by neglect of an insured ("neglect exclusion"), (id. at 24); and loss preceding or following intentional concealment or misrepresentation of any material fact, or false statements, by an insured ("concealment and fraud exclusion"), (id. at 29).

On September 17, 2013, during installation of replacement windows and sashes, agents of Belfor Property Restoration ("Belfor") discovered "damage" behind the Drenockys' stucco walls. (Doc. 8 ¶ 23; Doc. 25 ¶ 6; Doc. 1-9 at 11). A series of follow-up inspections revealed damage to framing, sheathing, stucco, and drywall throughout the house, with affected areas both near and far from windows and doors. (Doc. 1-9 at 8-11). David Mummert ("Mummert"), an agent of Belfor with extensive construction experience, was on site at the time of the discovery. (See id. at 6). Mummert believed moisture had "permeate[d] through the stucco." (Id. at 13). He did not associate the damage with defective window installation because the window frames themselves did not "show signs of decay," and there were no "visible signs of water damage on the interior walls." (Id. at 16).

The Drenockys reported the water damage to Cincinnati on the day of discovery. (See Doc. 8 ¶ 23; Doc. 1-4 at 1). On September 19, 2013, Cincinnati

dispatched Brent Leisenring, P.E. ("Leisenring"), to inspect the Drenockys' house. (Doc. 1 ¶ 24). Leisenring did not inspect the exterior of the house because it was rendered "inaccessible" by a tarp. (Doc. 1-5 at 2). He did, however, examine eight (8) photographs taken during the Belfor inspections and six (6) photographs taken during original construction in 2001. (See id. at 1). After analyzing the photos, Leisenring concluded that the deterioration of framing and sheathing resulted from improper window installation. (See id. at 3). Specifically, he determined that builders applied house wrap *after* installing the windows, cutting the house wrap around the windows rather than integrating it with the nailing flange using flashing, flashing tape, or wrap tape. (Id. at 2). This procedure differs from the usual practice of installing house wrap before window installation to form a continuous barrier against moisture. (See id.) Leisenring also noted a lack of weep holes in the stucco exterior, hypothesizing that this combination of factors allowed water to seep behind the walls' weather resistant barrier, damaging the framing and sheathing rather than draining back out through the stucco. (Id. at 3). He attributed these errors to Crawford. (See id.) The inspector reported his findings to Cincinnati in a letter dated October 9, 2013 (the "Leisenring report"). (See id. at 1).

Melissa Gascot ("Gascot"), Senior Claims Specialist for Cincinnati, visited the house to speak with Drenocky on October 14, 2013. (See Doc. 1-9 at 1, 13; Doc. 1 ¶ 27). Drenocky explained that Belfor employees discovered the water encroachment and attributed the problem to improper window installation. (Doc. 1-9 at 7). Drenocky also recalled exploring window installation issues in the course of the Crawford litigation, but he maintained that the earlier leaks stemmed from

4

faulty Pella sashes. (See id. at 9-10, 12). Drenocky noted that the superficial water encroachment ended after the replacement of the sashes. (See id.)

Cincinnati sent the Drenockys a letter preliminarily denying their claim on October 30, 2013. (See Doc. 1 ¶ 28; Doc. 1-6 at 2). The letter reiterated relevant coverage exclusions in the Drenockys' policy and specifically denied indemnity until completion of the investigation. (See Doc. 1-6 at 1, 2-7, 9). Cincinnati also requested numerous documents, including past inspection reports, and scheduled an examination under oath with Drenocky. (See id. at 7-8). During his examination on January 14, 2014, Drenocky denied retaining an expert inspector prior to September 2013 and denied that anyone had ever warned him of additional, unseen water damages. (See Doc. 1-7 at 60-62). The Drenockys later admitted the existence of the MacKinney letter and knowledge of its content. (Doc. 8 ¶¶ 15, 80).

Cincinnati filed its complaint (Doc. 1) for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 on April 17, 2015. Cincinnati seeks a declaration that it has no duty to indemnify the Drenockys on six grounds, citing: (1) the defective construction exclusion (Count I); (2) the seepage exclusion (Count II); (3) the known loss doctrine (Count III); (4) the policy's coverage term (Count IV); (5) the neglect exclusion (Count V); and (6) the concealment and fraud exclusion (Count VI). The Drenockys filed their answer, affirmative defenses, and counterclaim (Doc. 8) on June 22, 2015. Cincinnati filed its answer (Doc. 10) to the counterclaim on July 13, 2015.

Cincinnati filed the instant motion (Doc. 20) for partial judgment on the pleadings and a brief (Doc. 21) in support on November 24, 2015. Cincinnati moves

for judgment on all counts except Count IV. The motion is fully briefed and ripe for disposition.

## II. <u>Standard of Review</u>

A motion for judgment on the pleadings is a procedural hybrid of a motion to dismiss and a motion for summary judgment. Federal Rule of Civil Procedure 12(c) provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). Viewing the facts and related inferences "in the light most favorable to the nonmoving party," a court may grant the motion if the movant clearly establishes there are no material issues of fact and the movant is entitled to judgment as a matter of law. <u>Sikirica v. Nationwide Ins. Co.</u>, 416 F.3d 214, 220 (3d Cir. 2005); <u>see</u> <u>also</u> <u>DiCarlo v. St. Mary Hosp.</u>, 530 F.3d 255, 259 (3d Cir. 2008).

When ruling on a motion for partial judgment on the pleadings, the court considers "the pleadings and attached exhibits, undisputedly authentic documents attached to the motion for judgment on the pleadings if the plaintiffs' claims are based on the documents, and matters of public record." <u>Atiyeh v. Nat'l Fire Ins. Co.</u>, 742 F. Supp. 2d 591, 595 (E.D. Pa. 2010) (citing FED. R. CIV. P. 10(c); <u>Citisteel USA, Inc. v. Gen. Elec. Co.</u>, 78 F. App'x 832, 835 (3d Cir. 2003); <u>Chemi SpA v. GlaxoSmithKline</u>, 356 F. Supp. 2d 495, 496-497 (E.D. Pa. 2005)).

### III. Discussion

Cincinnati's Rule 12 argument is twofold: *first*, that the circumstances of the Drenockys' water damage actuate several contractual coverage exclusions—the defective construction exclusion, seepage exclusion, and neglect exclusion—as well as the known loss doctrine, (see Doc. 21 at 9-10); and *second*, that Drenocky's false statement during Cincinnati's investigation violated the policy's concealment and fraud provision, (see id. at 10). The Drenockys dispute Cincinnati's characterization of the damage and their statements during the investigation. (See Doc. 24 at 8-9). The court will address Cincinnati's arguments *seriatim*.

#### A. Exclusions for Defective Construction, Seepage, Neglect, and Known Loss

The parties' submissions present at least three separate theories concerning the cause of water damage to the Drenocky home. The first is long-term, hidden water seepage, originating at improperly installed windows and moving through the house's exterior walls. (See Doc. 1 ¶¶ 16-19, 26-27). The second is water leakage through faulty Pella window sashes, resulting in water accumulation on interior windowsills, superficial damage to paint and trim, and an odor in an upstairs bedroom. (See Doc. 8 ¶ 11). The third is water permeating the stucco to reach the internal structure of the exterior walls. (See Doc. 25 ¶ 13).

Cincinnati attributes deterioration of the house's framing and sheathing to water seepage. According to Cincinnati, the 2010 MacKinney letter correctly described the seepage issue and foreshadowed the damage Drenocky reported in 2013. (See Doc. 21 at 12). Cincinnati maintains that improper window installation activates the defective construction exclusion and the resulting flow of water falls

7

within the seepage exclusion. (See id. at 13, 15). Cincinnati further contends that, if the MacKinney letter is accurate, the Drenockys' knowledge of the ongoing damage implicates the policy's neglect exclusion and the known loss doctrine. (See id. at 17); see also Rohm & Haas Co. v. Cont'l Cas. Co., 781 A.2d 1172, 1176 (Pa. 2001).

The Drenockys dispute Cincinnati's contention that the damage resulted from water seepage originating at the windows. In the Drenockys' narrative, MacKinney's inspection addressed, but inaccurately assessed, the faulty sash problem. (See Doc. 24 at 6). The Drenockys note that replacement sashes remedied the problems with paint, trim, and odors. (Id.) The Leisening report affirms MacKinney's diagnosis, but the Drenockys contest the report's validity on the ground that Leisening examined photographs rather than physically inspecting the walls. (See id. at 4). They contend that Mummert's declaration both undermines Cincinnati's statement of facts and provides an alternative explanation for the damage. (See Doc. 30-2 at 4). Mummert opined that water permeating the stucco caused the framing and sheathing to rot. (See Doc. 25 ¶ 13).

The parties cite competing case law to support their respective contentions. The Drenockys rely on Shipman v. Gelso, No. 3:11-CV-1162, 2012 WL 7008939 (M.D. Pa. Sept. 17, 2012), for the proposition that categorical denial of an opposing party's claim creates an issue of material fact. Plaintiffs in Shipman moved for judgment on the pleadings on their allegations of housing discrimination and negligence. Id. at *1. The court denied the motion in light of the defendants' categorical denial of the allegations, which established "plainly disputed material issues of fact." Id. at *2.

The case *sub judice* differs from Shipman in the nature of its factual disputes. Shipman's discrimination and negligence claims involved subjective components which could not be proven on the pleadings. See id. at *1-2. The immediate factual issue is wholly objective: it concerns the source of damage to the Drenocky home's framing and sheathing. Exhibits attached by the parties, which include expert analysis, compel the court to look beyond conclusory assertions in the pleadings for an explanation of the damage. See Atiyeh, 742 F. Supp. 2d at 595. Consequently, the Drenockys' categorical denial of Cincinnati's *allegata* is insufficient to defeat the motion.

Cincinnati relies on Smith v. State Farm Fire & Casualty Co., No. 15-670, 2015 WL 7568326 (E.D. Pa. Nov. 24, 2015), as support for its contention that no issues of material fact remain. The plaintiff homeowner in Smith filed a claim under his insurance policy for water damage to stucco and sheathing. See id. at *2. The defendant insurance company denied the claim and moved for summary judgment on the ground that the homeowner did not bring the claim within one year after the damage occurred, as required by the policy. Id. at *1-2. The homeowner stated that the damage occurred less than a year before the claim, but a written report from a home inspector and accompanying photographs indicated the damage existed earlier. See id. at *2. The homeowner argued that the inspector "only detected moisture," but the report described "extensive rot" consistent with the damage ultimately described in the claim. Id. The court granted summary

judgment to the insurer, citing the "dearth of evidence" favoring the homeowner's account. Id. at *3.[1]

The instant matter is not without parallels to Smith. The Drenockys suffered chronic moisture issues and commissioned an expert to inspect their home long before making an insurance claim. (See Doc. 8 ¶ 11-14). The ensuing report, the 2010 MacKinney letter, clearly describes water seepage originating at the windows and attributes the problem to improper window installation. (See Doc. 1-2 at 1). MacKinney's diagnosis supports Cincinnati's causation theory. Absent evidentiary contravention, Smith would counsel that there are no issues of fact regarding the damage.

The distinction lies in the nature of the Drenockys' opposition and the scope of available information. The Smith plaintiff argued summarily that his inspector "only detected moisture" on the date in question—a comment on the inspector's findings disproved by the report itself. See Smith, 2015 WL 7568326, at *2. In contrast, the Drenockys challenge the fundamental accuracy of the MacKinney report. (See Doc. 24 at 15-16). The damage reported in 2013 is arguably consistent with MacKinney's warnings, but there is no proof in the present record that the same damage existed in 2010, or, if it occurred subsequently, that it occurred in the manner MacKinney predicted. (See Doc 1-2 at 1; Doc. 1-4). The Leisenring report

---

[1] Smith's Rule 56 posture does not render its guidance inapposite. Summary judgment is closely related to judgment on the pleadings. Similar to Rule 12(c), an issue is genuine in the Rule 56 context if the evidence might allow a reasonable jury to rule against the movant. Zavala v. Wal-Mart Stores, Inc., 691 F.3d 527, 545 (3d Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986)).

supports MacKinney's analysis, but that support is tempered by Leisenring's similar reliance on photographs rather than a physical assessment. (See Doc. 1-5 at 1). The Drenockys claim in response that the superficial paint, trim, and odor problems that inspired the MacKinney inspection ended with replacement of the Pella sashes. (Doc. 8 ¶ 13). Moreover, Mummert's declaration contravenes both the MacKinney letter and the Leisenring report.[2] (See Doc. 25 ¶ 16).

The MacKinney letter, Leisenring report, and Mummert declaration do not form a cohesive narrative. At this juncture, the cause and timing of water damage to the Drenocky home remain genuine and disputed issues of material fact. Hence, the court cannot adjudicate the defective construction exclusion, seepage exclusion, neglect exclusion, or known loss doctrine on the pleadings.

### B. Fraud and Concealment Exclusion

The policy also excludes coverage when a homeowner intentionally conceals or misrepresents a material fact (the "intentional concealment clause"), or makes a false statement (the "false statement clause"), relating to the subject claim. (Doc. 1-3 at 29). Cincinnati argues that Drenocky triggered both exclusions when he falsely swore during his examination under oath that no expert had warned him of improper window installation or the potential for additional, unseen water damage prior to September 2013. (See Doc. 1-7 at 60-63). In support, Cincinnati cites the MacKinney letter, which explicitly described improper window installation

---

[2] Cincinnati argues in its reply brief that Mummert's theory, even if correct, would place the damage within the defective construction exclusion. (Doc. 26 at 6). However, Mummert speculated only on the physical occurrence that might have caused the damage and made no related inferences about design or construction. (See Doc. 25).

11

methods and warned of future damage, (see Doc. 1-2 at 1-2), and the Drenockys' answer, which concedes the existence of the MacKinney letter and the Drenockys' knowledge of its content, (Doc. 8 ¶¶ 15, 80). Cincinnati alleges that Drenocky knowingly issued this false statement. (Doc. 21 at 19).

The Drenockys do not admit to making any misrepresentations. (See Doc. 24 at 14). Nonetheless, assuming falsity *arguendo*, the Drenockys suggest the incorrect statement was unintentional—that amid a decade of complicated renovation and litigation, Drenocky simply forgot about the MacKinney letter on the day in question. (See id. at 17).

There is no dispute on this record that Drenocky's statement during his examination under oath was incorrect. Drenocky had been warned of improper window installation by the MacKinney letter, as admitted constructively by the Drenockys themselves. (See Doc. 1-2 at 1; Doc. 8 ¶ 80). Hence, Drenocky's statement during his examination under oath that he received no such warning was necessarily erroneous. (See Doc. 1-7 at 60-62). A reasonable factfinder could not conclude otherwise.

The question of Drenocky's state of mind is more complicated. Generally, such inquiries are the province of the jury. See Justofin v. Metro. Life Ins. Co., 372 F.3d 517, 523 (3d Cir. 2004). However, exceptions exist. Cincinnati relies on Allstate Insurance Co. v. Kelly, 2007 WL 403919 (W.D. Pa. Feb. 1, 2007), in arguing that the court should decide Drenocky's state of mind on the existing record. Plaintiff in Allstate sought summary judgment on an insurance fraud claim against a homeowner. Id. at *1. The homeowner initially failed to disclose the true purchase

price of the property, that he was a heavy smoker, that other providers had refused to insure his property, and that he was operating an illegal five-unit boarding house on the property. See id. at *2. The court granted judgment to the insurer, finding that, given the degree of inconsistency between actual conditions on the property and the homeowner's representations, the homeowner must have known the information he provided was false. Id. at *4-5.

In the instant case, as in Allstate, information Drenocky provided Cincinnati was inconsistent with actual facts. The discrepancies in Allstate, however, were numerous and extreme, such that no reasonable jury could have found that the policyholder was unaware of his misrepresentations. The Allstate court could not have believed the claimant forgot that he was a smoker or that there were others renting rooms in his house. See id. at *4. *Per contra*, the MacKinney letter was not a fact of Drenocky's daily lifestyle, but merely a document received three years earlier. Considering the multitude of projects at the house, the complexity of the underlying damage, and the passage of time, a reasonable jury could determine that Drenocky simply forgot about the MacKinney letter during his examination under oath. Accordingly, the court must deny Cincinnati's request for judgment pursuant to the intentional concealment clause at this juncture.

The fraud and concealment exclusion contains a second relevant prong. The false statement clause purports to bar coverage if an insured makes a false statement, irrespective of the insured's state of mind. Cincinnati cites Peer v. Minnesota Mutual Fire & Casualty Co., No. 93-2338, 1995 WL 141899 (E.D. Pa. Mar. 27, 1995), in support of the proposition that Pennsylvania courts enforce such

13

provisions. In Peer, the defendant insurance company alleged plaintiff insureds had voided their policy by violating its concealment and fraud provision. Id. at *10. The language of the provision was nearly identical to that in the Drenockys' policy, including one clause that required intent and one clause that did not. See id. at *20. The Peer court issued summary judgment for the insurance company, but noted knowledge *and* intent on the insured's part, providing little guidance in the instant case. See id. at *34.

The Third Circuit Court of Appeals provides a more definitive representation of Pennsylvania law in Matinchek v. John Alden Life Insurance Co., 93 F.3d 96 (3d Cir. 1996). Therein, the court states that "an insurance contract is void if (1) the representation was false; (2) the insured knew it to be false when made or acted in bad faith; and (3) the representation was material to the risk being insured." Id. at 102 (citing N.Y. Life Ins. Co. v. Johnson, 923 F.2d 279, 281 (3d Cir. 1991); Shafer v. John Hancock Mut. Life Ins. Co., 189 A.2d 234, 236 (Pa. 1963)). Courts within this judicial district and elsewhere consistently apply this standard to concealment and fraud provisions, regardless of whether the provision specifically enumerates an intentionality requirement. See, e.g., Reese v. Allstate Vehicle & Prop. Ins., No. 14-1034, 2015 WL 8468504, at *20-21 (E.D. Pa. Dec. 9, 2015); Militello v. Allstate Prop. and Cas. Ins. Co., No. 1:14-CV-240, 2015 WL 7300520, at *8 (M.D. Pa. Nov. 18, 2015); Millard v. Shelby Cas. Ins. Co., No. 02-CV-1902, 2005 WL 2035860, at *4 (M.D. Pa. Aug. 24, 2005). Pennsylvania law makes clear the importance of the insured's state of mind in this context: "The law does not allow an insurer to rescind an insurance

policy because of innocent mistakes by the insured, even if those mistakes involved misrepresentations of material facts." Am. Franklin Life Ins. Co. v. Galati, 776 F. Supp. 1054, 1060 (E.D. Pa. 1991).  In effect, the concealment and fraud provision of the Drenockys' policy includes implied mental state and materiality requirements.

The present record establishes that Drenocky made a plainly inaccurate statement during his examination under oath on January 14, 2014.  However, the intentional nature of that inaccurate statement remains in genuine dispute.  As such, the court cannot issue judgment on the pleadings with respect to the policy's concealment and fraud exclusion.

## IV. Conclusion

The court will deny Cincinnati's motion (Doc. 20) for partial judgment on the pleadings.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:      July 7, 2016